ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

JOSEPH TARTAKOVSKY (CABN 282223)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7320
    FAX: (415) 436-7234
    Joseph.tartakovsky@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 4:19-CR-00585-003-HSG |
|     Plaintiff, | **GOVERNMENT'S SENTENCING MEMORANDUM** |
|   v. | Judge: Hon. Haywood S. Gilliam, Jr. |
| ERIK SAMUEL GONZALES, | Sentencing date:  October 16, 2024, 2 p.m. |
|     Defendant. | |

### I.    FACTUAL BACKGROUND

Between August 2014 and June 2019, Erik Samuel Gonzales conspired with the late Dr. Deane Crow and others to acquire or distribute some 76,000 hydrocodone and oxycodone for non-medical purposes. PSR ¶ 13. Gonzales, over these years, mastered techniques to acquire these opiates by fraud.

Specifically, in August 2018, he ordered blank prescription pads, from RxPads.com, purportedly under Dr. Crow's prescribing authority. Gonzales had the pads list, instead of Dr. Crow's actual office address, his mother's real estate outfit in Salinas, California. He put, as the phone number, a Google voice number that he set to forward to his personal cell. *Id.* at ¶ 14. (See images of the prescription pad and "office" below.) He then arranged for users to meet with Dr. Crow at his mother's office to buy

prescriptions for the oxycodone and hydrocodone. *Id*. at ¶ 16. Eventually he began to write prescriptions himself. *Id*. He recruited people to fulfill prescriptions and bring pills back to him; he paid those people in cash or pills. *Id*. He obtained prescriptions in the name of at least 18 individuals in addition to himself. *Id*.



One client explained how she would meet with Gonzales and Dr. Crow. Crow would write a prescription for Norco (a branded combination of acetaminophen and hydrocodone under Schedule II) and oxycodone pills, for $200 cash. *Id*. at ¶ 18. She would keep the Norcos but return the oxycodone tablets to Gonzales. At some point she began meeting with Gonzales alone to get the prescriptions. *Id*. On some occasions, Dr. Crow would prescribe only Norcos and Gonzales would add the oxycodone to the prescription.

Gonzales acted with sophistication and care to avoid detection and prevent the creation of evidence. He used the encrypted-chat app Wickr. *Id*. at ¶ 16, 17, 19, 20. When he sent a co-conspirator a message on Wickr, he would text the recipient to "check" to alert them to access the app. *Id*. at ¶ 16. Occasionally Gonzales would advise his client about which pharmacy to use to fill the prescription at, so that he could better manage arousing pharmacist suspicions and accomplish the obtaining of pills. *Id*.



When pharmacists called the number on the prescription, he was able to field the call and identify himself as Dr. Crow's office manager and lie to the pharmacist. *Id*. at ¶ 15. Gonzales would track prescriptions, monitor the California database for prescriptions filled under Dr. Crow's authority (so that Gonzales knew what authorities could see), keep copies

of prescriptions and records of the date filled, name, date of birth, phone number, claimed medical condition, and diagnosis code (which pharmacies track). *Id.* at ¶ 16.

Gonzales offered a $100 finder's fee to those who brought him new "pain" patients. US-600004. These individuals could typically keep the prescription for hydrocodone while returning the oxycodone to Gonzales. Gonzales vetted these recruits by looking at CURES, a database that shows a patient's prescription history, to assess whether the recruit was "qualified."

Some of the pills went to gang members who resold the pills for profit. PSR ¶ 10. Other pills were mailed by Gonzales out of state (evidently in hollowed out DVD boxes) where they were worth more. *Id.*

During the conspiracy, Gonzales was responsible for at least 53,885 oxycodone pills and 22,034 hydrocodone pills. *Id.* at ¶ 21. Gonzales agreed in his plea agreement that the converted drug weight of the oxycodone and hydrocodone obtained via prescriptions written under Dr. Crow's prescribing authority was at least 10,000 KG but less than 30,000 KG. *Id.*



As the FBI arrived to search Gonzales's home, he stabbed his phone with scissors and soaked it in water—both failed attempts to destroy the significant evidence that he knew was on the phone. *Id.* at ¶ 22. That day he lied to investigators, claiming that he only filled out illicit blank prescriptions for himself and his brother. *Id.* at ¶ 24.

Gonzales pleaded guilty to a two-count Superseding Indictment charging violations of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(C)—Conspiracy to Distribute a Controlled Substance (Oxycodone and Hydrocodone) (Count One); and 21 U.S.C. §§ 846, 843(a)(3) and (d)(1)—Conspiracy to Acquire and Obtain Possession of a Controlled Substance by Misrepresentation, Fraud, Forgery, Deception and Subterfuge (Count Two). The plea came in December 2022, shortly before trial set for January 2023. Doc. 281.

## II.     GUIDELINES CALCULATION

The plea agreement set out the following Guidelines calculation. Probation agrees with it. PSR ¶ 4.

    Base Offense Level, U.S.S.G. § 2D1.1(a)(5) & (c)(3):   34
    Acceptance of Responsibility:   -3
    Adjusted Offense Level:   31

The PSR calculates four criminal history points and thus a Criminal History Category of III. *Id.* at ¶ 46. The convictions were for a DUI in 2007, *id.* at ¶ 42, a second DUI and a possession for sale conviction in 2016, *id.* at ¶ 43, and a third DUI in 2019, *id.* at ¶ 44. During the second DUI conviction, Gonzales was arrested after swerving dangerously, nearly causing several crashes, and passing out at the wheel. *Id.* at ¶ 43. Then he refused to obey an officer and, even back at the station, he fought with law enforcement and was eventually Tasered. In his trunk, officers found 800 pills marked as "Xanax." *Id.*

The Guidelines range is 135-168 months. *Id.* at 92. Count Two has a statutory maximum of not more than four years. PSR ¶ 92; 21 U.S.C. § 843(d)(1).

The government agrees with the PSR's recommendations as to a fine, forfeiture, and supervised release.

## III.     GOVERNMENT'S SENTENCING RECOMMENDATION

The government recommends 54 months. This is 40% of the low end of the Guidelines.

The government's view is that a proper sentence must distinguish (1) the conduct that Mr. Gonzales engaged in because he was addicted to opiates and (2) the conduct that he engaged in because he chose to profit from an opiate-selling scheme. Millions of Americans have succumbed to opiate dependency. But only a tiny minority of them have also engaged an advanced pill-reselling scheme like this. The tens of thousands of pills that his labors improperly flooded into the stream of commerce (and bloodstreams of users) surely caused harm. A portion of these pills were paid for by taxpayers.

Defense counsel writes, in objecting to the PSR, that "during the course of the charged conduct, Mr. Gonzales was deeply addicted to opiates, and his conduct typified that of a user desperate to obtain pills for himself." PSR Objection Number One. The government (like the PSR author) does not see how this fits with the facts. No one doubts the power of opiate addiction to produce obsessive, desperate behavior to procure pills. But Mr. Gonzales did not obtain pills for only himself. He obtained pills—ten

of thousands of pills—for many others. And for sale. He did so even though he could have easily limited his pill acquisition to meet his own needs. This does not "typify" a user. It typifies a dealer.

Gonzales also wrote some damning statements; the defense asserts that Gonzales's substance abuse means that "even his own statements or writings are not reliable." *Id*. This, too, is inconsistent with the evidence, not to mention science on the issue. As a general matter, opiate addiction drives reward-based decision making but it does not impair cognitive functioning and executive control in the ways counsel suggests, resulting is statements that are mere "rantings" that are "inherently unreliable." *See, e.g.,* Steenbergen et al., *The role of the opioid system in decision making and cognitive control: A review*, COGNITIVE, AFFECTIVE, AND BEHAVIORAL NEUROSCIENCE, 2019; 19(3): 435–458.[1]

To the contrary, Gonzales displayed considerable mental acuity and coordinating capacity in carrying on his scheme. Discussed above, for instance, were the maneuvers to avoid pharmacist detection. But it's also evident in correspondence that Gonzales wrote (US-906711-13; *see* PSR ¶ 20), where he sounds more like a poised businessman than a frantic user:

- "I have heard it all... people get behind on payments with me because they don't budget well and they are also spending 2k to 3k on their own pills each month. They dont it on Purpose they are just careless and they dont plan well and even though they are making a lot of money they still only plan for today without thinking about tomorrow. Because of their habit and their poor money planning they put themselves in a huge hole, and they think they will get out of it by coming up with a story where it was not their fault and they totally want to make things right but they need more scripts even though they owe me money etc. Usually when a person reaches this point they are done [as an associate of his]."

- "She has had 2 scripts. 1 for 15 days now and the other one for 7 days now. She owes me 960 each script. She also owes me for 10 pills I gave her 30 days ago. So this is what she owes me:1. 10 pills which comes out to 160 dollars total. She got these pills from me 30 days ago. When she got them she promised me she would pay them the next day...it has now been 30 days.2. She owes me one script where we split 120 blues. My share is 960. I gave her this script on the 13th of this month. The pharmacist said she filled it on the 13th of this month. Brittney [Cardona] says the pharmacist is lying and she barely got it? She owes me 960 for this one.3. She owes me for a 2nd script which I gave her on the 22nd of this month. Same thing. We split 120 blues. She owes me 960 for this one too. So here is what she owes:960 + 960 + 160 = $2,080.00Brittney has 4 scripts due one today and a couple more over the next 3 to 4 days but I told her I will not give her those scripts till she squares up."

---

[1] Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6599188.

There is nothing unreliable about these writings. Addiction has many potential side effect. One of them, displayed above, is the finicky attention to the details of counting pills and tracking debts.

Other messages he sent were bullying, giving a sense of how he enforced compliance from the underlings he managed (US-636468):

| Timestamp | Direction | Message |
|---|---|---|
| 8/30/2018 4:55:59 AM(UTC+0) | Sent | Are we meeting or r u sending me the acct # |
| 9/1/2018 4:44:28 PM(UTC+0) | GONZALES Read | Check |
| 9/1/2018 4:47:54 PM(UTC+0) | GONZALES Read | Check it everything closes soon. If I wait I am fucked |
| 9/1/2018 6:03:40 PM(UTC+0) | GONZALES Read | Everything close in an hour. I need u to communicate so 8 can get in my damn car and drive there but I dont want to drive for nothing check your phone!!!!! |
| 9/1/2018 6:07:39 PM(UTC+0) | GONZALES Read | I'm giving me 30 minutes to call me after that I block your fuckwn number and I am never talking to u again. Do t fucken text me call me. U have 30 minutes... after that I am calling myoho e company I am blocking your fucksn number. I have had with your lies and fucke. Manipulating ways.... you may feel like a queen now but give it 30 days and you are going to look back on this moment regret it. 30 minutes is all u get and I am done with u |
| 9/1/2018 7:10:24 PM(UTC+0) | Sent | Bro my wife in the hospital |

In the end, Mr. Gonzales had far more than an addiction problem. He had a greed problem, a morality problem, a willingness to break the law over many years. If his offenses were only to do what was needed to quiet his own addiction, he would not be standing before the Court.

That said, the government recognizes that Mr. Gonzales has worked to reform himself. The Court no doubt saw promise in Gonzales and chose to give him a chance to prove rehabilitation. The undersigned reviewed pretrial progress reports and spoke with defense counsel. Based on that information, the government agrees to the substantially below-Guidelines sentence recommended above.

Finally, the government seeks to place Gonzales in a hierarchy of responsibility among co-defendants. The fact is that Gonzales was the most culpable of the group—even more so, near the end of the conspiracy, than Dr. Crow, who was evidently ailing from dementia. Gonzales took advantage of lower-functioning addicts to procure tens of thousands of pills, over years, many of which he then re-sold. Gonzales created prescriptions that Crow did not know about. He received cash that went into his pocket alone. He recruited and coordinated so that the scheme took on its large criminal dimensions.

Co-defendants Dr. Deane Crow and his wife Diane both died before their cases could be adjudicated. Co-defendant Joe Bernal graduated from the Conviction Alternatives Program and was sentenced to time served and 3 years' supervised release.  Brittney Lynn Cardona was sentenced to 2 years' probation.  Jessica Bravo, charged separately, received diversion and had her case dismissed.

## IV.     CONCLUSION

For the reason above, the government respectfully recommends a sentence of 54 months.

DATED:  October 2, 2024                                Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney


_____/s/_____
JOSEPH TARTAKOVSKY
Assistant United States Attorney

GOVERNMENT'S SENTENCING MEMO             7
4:19-CR-00585-003-HSG